956 F.2d 268
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Shirley BLAIR, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 90-6130.
 United States Court of Appeals, Sixth Circuit.
 March 6, 1992.
 
 1
 Before KEITH and MILBURN, Circuit Judges; and HILLMAN, Senior District Judge*.
 
 
 2
 Plaintiff Shirley Blair ("Blair") appeals from the district court's June 8, 1990, order granting summary judgment in favor of defendant, the Secretary of the Department of Health and Human Services (the "Secretary") in this action filed pursuant to 42 U.S.C. § 405(g). For the reasons stated below, we AFFIRM.
 
 I.
 
 3
 At the time of the hearing before the Administrative Law Judge ("ALJ"), Blair was fifty years old and resided in Rutherford County, Tennessee. Blair completed the twelfth grade and attended night school in 1958. She attended a class at a hospital where she once worked to learn necessary secretarial procedures, medical terminology and the use of hospital forms. She last worked as a "unit secretary" at a hospital from 1978 until 1984. Prior to that she worked as an insurance clerk from 1974 until 1978.
 
 
 4
 Blair regularly drives an automatic automobile. She meets friends once a week at a local restaurant and at local social outings. Blair testified that she had seen her personal physician, Dr. Alfred Callahan, III, ("Dr. Callahan") only one time during the previous year.
 
 A.
 
 5
 In May 1982, Blair was hospitalized for treatment of a typical chest pain, digestive problems and low back pain. She weighed 205 pounds and her blood pressure was 150/80. Blair indicated that she underwent a thyroidectomy in her youth and took thyroid medication, but her current thyroid levels were normal. Coronary arteriograms were normal. Lumbar x-rays were essentially normal, showing only minimal narrowing at L5-S1. Gastrointestinal testing showed gastric polyps and mild chronic inflammation. Blair showed below normal potassium levels and was diagnosed as having diuretic-induced hypokalemia. Dr. Alan Graber ("Dr. Graber") put Blair on a 1200 calorie diet. A note by Dr. Graber from June 1982 indicated that Blair was not sticking to her diet and that she had gained two and a half pounds.
 
 
 6
 In August 1982, Blair was hospitalized again for treatment of hypokalemia. At this time she weighed 200 pounds and her blood pressure was 150/100. In April 1983, Blair was hospitalized because of complaints of abdominal pain. An EKG was normal; testing showed gastric polyps and a sightly enlarged kidney. She was put on a bland diet and instructed to lose weight. In July 1983, Dr. Graber noted that Blair's weight had risen to 216 pounds.
 
 
 7
 In April 1984, Dr. Ray Lowery ("Dr. Lowery") hospitalized Blair for a bulging disc. A CT scan of her lumbar spine showed a mild or slight central bulging of the L5-S1 disc with no associated compromise of the nerve roots. A lumbar myelogram showed a bulging L5-S1 disc but was otherwise negative. X-rays of the lumbar spine were negative except for a slight joint space narrowing at L5-S5 and L5-S1 levels with minimal degenerative changes. Electromyogram and nerve conduction studies were also normal with no evidence of radiolopathy.
 
 
 8
 In July 1984, Dr. Lowery referred Blair to Dr. Everette I. Howell ("Dr. Howell"), a neurologist. Dr. Howell did not find any abnormality that required invasive treatment and recommended exercises and stress management. In October 1984, Dr. Howell referred Blair to Dr. Callahan. After his examination, Dr. Callahan recommended physical therapy and walking.
 
 
 9
 During this period of time, Dr. Tom Johns ("Dr. Johns") also examined Blair. Dr. Johns followed Blair's treatment from April 1984 to October 1984, but noted that he was uncertain of the origin of Blair's pain. Dr. Johns indicated that Blair was neurologically intact and that her condition should be managed as mechanical lower back pain. He opined that, during this period, Blair could sit without limitation, stand and walk 6 hours in a work day and carry 15-25 pounds frequently. In November, Blair had an electromyogram that showed only mild abnormalities.
 
 
 10
 In February 1985, Dr. Callahan continued to recommend a conservative exercise program and suggested that Blair lose weight to alleviate her low back discomfort. He prescribed amitriptyline for pain control at night. In September 1985, Dr. Callahan stated that at that time, Blair retained her disability solely on the basis of pain. However, Dr. Callahan was unable to diagnose the source of Blair's pain. After a CT scan and myelogram, Dr. Callahan recommended a re-examination of her lumbar spine. Dr. Callahan also noted that Blair had difficulty with her knees that was aggravated by her weight. He felt that these knee problems interfered with her ability to sustain her back exercise program.
 
 
 11
 In May 1986, a magnetic resonance imaging of Blair's lumbar spine was performed. It revealed a moderate central bulge at the lumbosacral joint. It showed only mild degeneration of the L4 and L5 discs and minimal bulges involving the L2-3 and L3-4 discs. In August 1986, nerve conduction studies showed no evidence of peripheral neuropathy or radiculopathy in the muscles of the lower extremities.
 
 
 12
 In October 1986, Dr. Callahan found that Blair had mild carpal tunnel syndrome and stated that:
 
 
 13
 Ms. Blair continues symptomatic with pain, discomfort and limitation of motion, as she has over the two years I have known her. I would not be surprised if any additional impairment was not seen. I don't seriously think that she will be better in terms of her low back pain one year from now than she is right now.... I am truly sorry that there seems to be no effective way for [her] to win and get better over this thing.
 
 
 14
 Transcript at 188-89.
 
 
 15
 In July 1986, Dr. Jay Oglesby ("Dr. Oglesby") examined Blair. At that time, she complained of persistent non-radiating low back pain, pain in both knees and her left knee's tendency to "give away." Blair exhibited an uncoordinated, waddling gait, but Dr. Oglesby noted that her gait showed no sign of pain avoidance. Blair's spine showed no tenderness, spasm or malalignment. Dr. Oglesby described Blair's back motion as somewhat limited, primarily caused by apprehension, stiffness and girth rather than pain. Knee x-rays showed patellofemoral arthrosis, but well preserved tibiofemoral compartments. Blair's knee demonstrated significant crepitus, but showed a full range of motion. Her knees exhibited no instability or sign of internal derangement. The neurovascular examination of Blair's lower extremities was normal and there was no sign of sciatic or femoral nerve irritation. Her ankle and hip motion were unremarkable. Dr. Oglesby recommended weight reduction and the administration of non-steroidal anti-inflammatory drugs. He rated Blair's overall permanent disability at 13%.
 
 
 16
 In August 1986, an EMG again showed no sign of peripheral neuropathy or radiculopathy but did reveal abnormalities compatible with right carpal tunnel syndrome. In October 1986, Dr. Graber examined Blair. Blair weighed 216 pounds and her blood pressure was 180/110. A dietary consultant noted that Blair's ideal weight was 120 pounds and that Blair's goal was to weigh 180 pounds. The consultant observed that Blair had a history of hypertension, but was not following an appropriate diet. Blair showed very little knowledge of the relationship between the sodium content of food and blood pressure. Blair was instructed on this topic and given a prescribed diet plan.
 
 
 17
 Dr. Graber's notes show that Blair weighed 208 pounds in November 1986, and that her blood pressure was 140/90. At her dietary consultation that month, Blair expressed frustration with the taste of food without salt. Blair was advised as to alternate seasoning methods and to continue her diet. The consultant directed her to use multivitamins and to return in one month for a check of the detailed diet record she was supposed to keep. Dr. Graber's later notes show that Blair did not return for any further dietary consultation sessions.
 
 
 18
 In January 1987, Dr. Graber saw Blair twice. On January 7, 1987, she complained that she was having trouble thinking and was experiencing hot flashes. She weighed over 211 pounds and her blood pressure was 160/100. On January 16, 1987, she was having heart palpitations and feeling worried. Her weight and blood pressure had not changed significantly. Dr. Graber considered the possibility that Blair was having a recurrence of hypokalemia, but testing showed that this was not the case. In February 1987, Blair reported that her palpitations had stopped, but that she was still experiencing hot flashes in the evening. Her blood pressure was 140/88. An EKG showed no abnormalities.
 
 
 19
 In February 1987, Dr. Callahan found that Blair's pain was incapacitating and her disability seemed to be complete. In April 1987, Dr. Callahan explained his February 1987 report to mean that Blair was completely disabled. In a medical assessment rendered during April 1988, Dr. Callahan stated as to Blair's limitations of sitting, standing, lifting and bending caused by pain in the neck, low back and legs,
 
 
 20
 Ms. Blair suffers from a chronic, mechanical low back syndrome which produces pain. This pain is incapacitating and results in her inability to participate in any and all work. By this, I mean work that would require mobility as well as sitting.
 
 
 21
 Transcript at 259.
 
 
 22
 In November 1987, Dr. Graber saw Blair for complaints of epigastric pain and right rib pain. Based on Blair's complaints and a chest x-ray, Dr. Graber diagnosed possible osteoporosis. At the time of this examination, Blair weighed 203 pounds and her blood pressure was 140/90. In December 1987, because of concern about possible osteoporosis in Blair's neck, low back and right hip, Dr. Graber conducted further testing. X-rays of Blair's neck and right hip were normal; her lumbar spine showed only minimal osteoporosis. A CT bone marrow analysis was within normal limits. Blair's weight was 200 pounds; her blood pressure was 130/80.
 
 
 23
 In February 1988, Dr. Graber indicated that testing had not shown any significant degree of osteoporosis as a basis for her complaints. Dr. Graber concluded that he was not aware of any mental impairment or of any physical inability to do normal work-related activity.
 
 
 24
 In May 1988, Dr. Frank Rembert ("Dr. Rembert") performed a consultative examination of Blair. At this time, Blair complained of back pain radiating to both legs, knee pain and swelling of both feet. Her current weight was 199 pounds and her blood pressure was 140/70. Blair exhibited a full range of motion in her joints and back, straight leg raising was negative. She displayed mild crepitus in her knees, but no sign of neurological abnormalities. Dr. Rembert noted that, overall, Blair's blood pressure appeared well-controlled. He noted no sign of hearing problems when he deliberately dropped the volume of his voice. Dr. Rembert felt that, other than the need to avoid prolonged standing of 6-8 hours per day, Blair had no work related limitations. Following Dr. Rembert's examination, Dr. Frank Kinnard ("Dr. Kinnard") reviewed the medical records to date and concluded that Blair retained the residual functional capacity for medium work.
 
 
 25
 In April 1988, Dr. Callahan reported that Blair suffered from a chronic mechanical low back pain syndrome that caused incapacitating pain and prevented her from performing even sedentary work. In another report, Dr. Callahan opined on April 6, 1989, that an operation would not improve Blair's pain problem and that he would not advise an operation. He opined that the prognosis for Blair was extremely guarded and that he was very pessimistic concerning reduction in pain over time.
 
 
 26
 In June 1988, Dr. Graber saw Blair twice for complaints of heart palpitations and pain radiating from her chest into her left arm. An EKG showed no cardiac abnormalities, despite the fact that Blair reportedly experienced an episode of chest pain while the EKG was being conducted. At the time of this examination, Blair weighed 199 pounds; her blood pressure was 140/88. Testing showed Blair's potassium levels to be normal. Dr. Graber's impression was that Blair's chest pain was not cardiac in nature. Later that month, twenty-four hour Holter monitoring showed no sign of ischemia; Dr. Graber described the results of this test as being within normal limits. Dr. Graber noted that Blair was upset when she learned she did not have a demonstrable heart problem.
 
 B.
 
 27
 Blair applied for disability insurance benefits on December 10, 1987. She claimed disability since June 1984. In her application Blair asserted that she was disabled as a result of severe pain and limitation of motion as well as postural restrictions resulting from back injury. In addition, Blair alleged osteoporosis, hearing loss, irregular heartbeat, hypertension, thyroid problems and arthritis. She also wrote that she sat and walked eight hours a day and stood only one hour a day with frequent lifting of ten pounds and some lifting of patients who fainted. Blair's primary duties, however, were clerical tasks. Blair's previous work was as an insurance clerk and underwriter from 1974 until 1978. These jobs included typing, filing, and answering the telephone.
 
 
 28
 After Blair's application was denied initially and on reconsideration, she sought and received a hearing before an ALJ. At the hearing before the ALJ, Blair explained that she had more responsibilities than unit secretaries on other floors at the hospital. Blair also stated that she actually lifted between fifteen and twenty pounds frequently and between twenty to twenty-five pounds only once a month. Blair estimated that she was on her feet about three hours during the work day.
 
 
 29
 On January 25, 1989, the ALJ denied Blair's application. The ALJ found that Blair retained the capacity to perform light and sedentary work. Accordingly, the ALJ determined she could still perform her past jobs as hospital ward and insurance clerk as these were customarily performed in the national economy. The Appeals Council denied Blair's request for review, thus rendering the ALJ's decision the final decision of the Secretary of Health and Human Services (the "Secretary") in this case.
 
 
 30
 Blair filed a timely action for judicial review of the Secretary's decision. On May 18, 1990, following the filing of cross-motions for summary judgment, the United States magistrate issued a report recommending affirmance of the Secretary's decision to deny benefits. Blair filed objections to the magistrate's report. On June 8, 1990, the district court entered an order adopting the magistrate's report and affirming the Secretary's denial of benefits. Blair filed a timely notice of appeal.
 
 II.
 A.
 
 31
 This Court's review of the Secretary's decision denying disability insurance benefits is limited to determining whether the findings of the Secretary are supported by substantial evidence. 42 U.S.C. § 405(g); McCormick v. Secretary of Health & Human Servs., 861 F.2d 998, 1001 (6th Cir.1988); Landsaw v. Secretary of Health & Human Servs., 803 F.2d 211, 13 (6th Cir.1986). The weighing of conflicting evidence and the evaluation of credibility are beyond the scope of review. Bradley v. Secretary of Health & Human Servs., 862 F.2d 1224, 1228 (6th Cir.1988). When substantial evidence supports the Secretary's decision, the decision must be affirmed, even though substantial evidence might also support a plaintiff's claims. Smith v. Secretary of Health & Human Servs., 893 F.2d 106, 108 (6th Cir.1989). Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a scintilla and less than a preponderance. Richardson v. Perales, 402 U.S. 389 (1971).
 
 
 32
 A claimant must provide medical evidence that adequately documents the nature, severity and functional effects of any allegedly disabling impairments. Bradley, 862 F.2d at 1228 n. 2; 20 C.F.R. § 404.1512 (1990). The claimant bears the burden of proving that her condition meets or equals a listed impairment. See Buress v. Secretary of Health & Human Servs., 835 F.2d 139, 140 (6th Cir.1987). A claimant who does not meet or equal a listed impairment bears the further burden of proving that she can no longer perform her past relevant work. Smith, 893 F.2d at 109. When a claimant fails to meet the burden of proving that her impairment did, in fact, cause disabling functional limitations, her application is properly denied. King v. Secretary of Health & Human Servs., 896 F.2d 204, 205-06 (6th Cir.1990).
 
 B.
 
 33
 Blair contends that the ALJ failed to properly consider her complaints of incapacitating pain. She maintains that her subjective complaints clearly and unquestionably arise from conditions which could reasonably be expected to cause incapacitating pain. Blair further argues that the Secretary did not give appropriate consideration to the opinion of Dr. Callahan, her treating physician. Blair relies principally upon Dr. Callahan's opinion to substantiate her claim of disabling pain.
 
 1.
 
 34
 In Duncan v. Secretary of Health & Human Servs., 801 F.2d 847 (6th Cir.1986), this court established a two-part test to evaluate allegations of disabling pain. After concluding that there is objective medical evidence of an underlying medical condition, the court will then determine the following: first, whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or second, whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain. See id. at 853; McCormick, 861 F.2d at 1003.
 
 
 35
 Here, Blair has not satisfied the Duncan test. The objective evidence supports neither the severity of the pain nor severity of a condition which can reasonably be expected to produce disabling pain. The medical opinions were conflicting. Although Dr. Callahan expressed a medical opinion that Blair is disabled because of pain, the other physicians who treated and examined her did not share that opinion and introduced conflicting evidence. Dr. Callahan's medical opinion was not supported by objective medical findings. Although Blair presented some radiological evidence of relatively minimal abnormalities, neither the radiological nor the other medical evidence documented a condition reasonably likely to cause the disabling pain that she claimed to have experienced. Thus, despite Dr. Callahan's opinion to the contrary, she did not prove that she had a condition that caused disabling pain. In fact, Blair did not introduce any objective medical evidence to substantiate her assertions of severely disabling pain.
 
 2.
 
 36
 Blair argues that the appropriate weight was not given to the opinion of Dr. Callahan, her treating physician, that she is disabled because of severe pain. We generally accord substantial deference to medical opinions and diagnoses of treating physicians; and if the opinions are uncontradicted, we accord complete deference. King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984). However, this is true only if the treating physician's opinion is based on sufficient medical information. Landsaw, 803 F.2d at 213. An ALJ is not bound by a treating physician's conclusory statement that the claimant is disabled. Miller v. Secretary of Health & Human Servs., 843 F.2d 221, 224 (6th Cir.1988).
 
 
 37
 In Hall v. Bowen, this Court held that an ALJ may reject a treating physician's determinations "when good reasons are identified for not accepting them." Hall v. Bowen, 837 F.2d 272, 276 (1988). Hall required the ALJ to weigh a residual functional capacity evaluation prepared by a consulting physician who examined Hall for the Secretary. The treating physician's evaluation stated that Hall's back injury prevented him from performing either light or sedentary work. The consulting physician, while finding essentially the same impairments as Hall's physician, found that Hall could perform sedentary work which allowed alteration between sitting, standing and walking. The ALJ found that the inconsistency between the treating physician's opinion and his earlier evaluations and his failure to identify any clinical findings that supported his later conclusion rendered his opinion unacceptable. The Court concluded that the ALJ and the Secretary gave due deference to the treating physician's opinion, but were required to resolve the conflict in the evidence between the physicians' respective evaluations. The Court concluded that substantial evidence on the record as a whole supported the finding that the plaintiff was capable of performing sedentary work. Id.
 
 
 38
 The ALJ in the instant case identified a valid reason for not accepting Dr. Callahan's determination--it was not supported by clinical, diagnostic evidence as were the opinions of Drs. Graber and Oglesby. See King, 742 F.2d at 973. The notes and reports of Drs. Graber, Johns, Lowery, Howell, Oglesby and Rembert document few, if any, persistent abnormalities during the period at issue here. The record does not show any instances of muscle spasm, reflex deficits or motor weakness, and only isolated instances of lumbosacral tenderness. Blair occasionally displayed some limitation of back motion, but this appeared to Dr. Oglesby to be due to apprehension, stiffness and girth, rather than to pain. Although Blair's knees displayed some crepitus, their range of motion was not limited. One problem for which Blair did have objective evidence, the intermittent arm numbness and tingling during 1984-1986 which resulted from right carpal tunnel syndrome, was corrected by surgery in August 1986. X-rays, CT scans, EMGs, a myelogram, and an MRI report provided no explanation for Blair's complaints of disabling pain. In total, these tests showed no more than minimal arthritis and some mild to moderate disc bulging, with no sign whatsoever of radiculopathy or nerve root compromise.
 
 
 39
 The physicians found no objective evidence sufficient to support disabling pain under either prong of the Duncan test. Furthermore, the opinions and tests of the other physicians provide substantial evidence that Blair was not disabled and could perform light to sedentary work.
 
 
 40
 For instance, although Blair claims disability since 1984 because of a wide array of impairments, Dr. Graber, one of her treating physicians since 1982, did not support her claim. When reporting on Blair's condition in February 1988, Dr. Graber stated, "I am not aware of any mental impairment or of any physical inability to do normal work-related activity." Dr. Graber's later treatment notes do not document any change in his opinion. Other doctors who treated Blair during 1984 concurred that she was not disabled. Dr. Johns felt that Blair could do the activities necessary in light work. Dr. Howell concluded that Blair could do a 'light duty' job. In addition, Dr. Rembert, who examined Blair in May 1988, believed that the only work restriction she had was the need to avoid prolonged standing of more than 6 hours per day. Dr. Kinnard, who reviewed Blair's medical records for the period through May 1988, concluded that she could do medium work.
 
 
 41
 These physicians' opinions provided substantial support for the Secretary's finding that Blair remained able to do light and sedentary work. Furthermore, the totality of the objective medical findings in the record supports these conclusions. See Atterberry v. Secretary of Health & Human Servs., 871 F.2d 567, 570-71 (6th Cir.1989); Hall, 837 F.2d at 276. The Secretary properly relied on these opinions supported by objective evidence since the conflicting opinion of one treating physician was not supported by objective evidence.
 
 3.
 
 42
 The Secretary found that Blair's past job as an insurance clerk was customarily performed as a sedentary job in the national economy and that her job as a hospital ward clerk was typically performed as a light level job. The Secretary determined that Blair could therefore perform her past relevant work. Accordingly, the Secretary found Blair not disabled and denied her application for disability insurance benefits.
 
 
 43
 Blair argues that the Secretary's finding that she could do light and sedentary work was unsupported by the record. She further contends that her past work involved more than light exertion.
 
 
 44
 The Secretary's finding that Blair remained capable of performing light and sedentary work was supported by (1) the findings and opinions of treating physicians and a consulting examiner; (2) the assessment of a reviewing physician; (3) the lack of credible medical evidence supporting Blair's claim of more severe limitations; and (4) the relatively minimal amount of treatment sought by Blair for her allegedly incapacitating pain. We find these factors provided substantial support for the Secretary's evaluation of Blair's capacity for light work activities.
 
 
 45
 Blair's prior employment as an insurance clerk and unit secretary fit the characterization of light and sedentary work. Because Blair retained the residual functional capacity to perform light work activities, the ALJ correctly concluded that Blair could perform her past relevant work as either a ward clerk or insurance clerk and was not disabled under the Act.
 
 
 46
 Blair bore the burden of proving that she was unable to perform her past work, not only as she actually performed it, but also as it is typically performed in the national economy. See Studaway v. Secretary Health & Human Servs., 815 F.2d 1074, 1076 (6th Cir.1987). Relying on the U.S. Department of Labor's Dictionary of Occupational Titles (4th Ed.1977) ("DOT"), the Secretary found that Blair's past job as an insurance clerk was customarily performed as a sedentary job and that her past job as a hospital unit secretary was customarily performed as a light job. Blair takes issue with the Secretary's categorization of her past work, arguing that the DOT spells out only the type of job activities required by occupations, not the functional capacities needed to do such occupations.
 
 
 47
 Blair correctly contends that the DOT itself does not spell out the functional requirements of the occupations that it lists. This does not mean, however, that the Secretary's characterization of her work was erroneous. The magistrate noted that such functional requirements are set forth in a companion volume to the DOT, the U.S. Department of Labor's Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (1981) ("Selected Characteristics"). In addition, a vocational specialist indicated that Blair's past job as an insurance clerk was a sedentary occupation and that her job as a hospital ward clerk was a light occupation. The Secretary's reliance on information from DOT and Selected Characteristics and the opinion of a vocational expert was expressly authorized by regulation. 20 C.F.R. §§ 245.1566(d), (e) (1990).
 
 
 48
 In sum, Blair failed to prove that her impairments caused limitations that prevented her from doing her past type of work in the insurance and hospital fields. Accordingly, the Secretary properly rejected her claim of disability.
 
 III.
 
 49
 For the foregoing reasons, we AFFIRM the decision of the Honorable L. Clure Morton, Senior United States District Judge for the Middle District of Tennessee.
 
 
 
 *
 The Honorable Douglas W. Hillman, Senior United States District Judge for the Western District of Michigan, sitting by designation